UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 8/31/2018

IVA WESTBROOKE,

                Plaintiff,

      v.

BELLEVUE HOSPITAL CENTER, NYC
HEALTH & HOSPITALS CORP., and CITY
OF NEW YORK,

                Defendants.

No. 16-CV-9845 (RA)

MEMORANDUM OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Iva Westbrooke, proceeding *pro se*, brings this action against her former employers Bellevue Hospital and New York City's Health & Hospitals Corporation ("HHC"), as well as the City of New York, for various employment-discrimination and retaliation claims arising from her employment at Bellevue. Now before the Court is Defendants' amended motion to dismiss this case under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. 30. Defendants argue that Westbrooke's claims are barred by a release that she signed after her termination and, alternatively, that her claims fail to state a claim and are barred by the statute of limitations. For the reasons that follow, the Court grants Defendants' motion.

## BACKGROUND[1]

Westbrooke is an African-American woman who walks with a cane and was born in 1954.

---

[1] The facts in this section and throughout this Opinion are drawn from Westbrooke's Amended Complaint and its attachments (Dkt. 3), her opposition to Defendants' motion (Dkt. 34), and the exhibits and declaration in support of Defendants' motion to the extent they are integral to the Amended Complaint as explained below. *See generally Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). All facts are accepted as true and are construed in the light most favorable to Westbrooke. *Id.* at 510. The Amended Complaint and its attachments are cited jointly as "Am. Compl." and pages from the complaint and attachments are counted from the first page of the Amended Complaint at Dkt. 3.

She began working for the HHC at Bellevue Hospital in 2011 and was promoted in July 2013 to become the director of respiratory care. During her time at Bellevue, Westbrooke allegedly experienced and complained about discriminatory treatment by her supervisors and colleagues.

Specifically, Westbrooke experienced at least three types of purportedly discriminatory treatment. First, supervisors allegedly made various comments about or to her regarding her disability. For example, she says she overheard a supervisor named Richard Frankel call her a cripple on "several occasions" in 2012 and 2013 and, after she was promoted, a different supervisor named Keith Kerr told her that she "would not be considered fit for duty if [she] was walking with a cane." Am. Compl. at 5, 8, 10 (Dkt. 3).[2] Second, "[w]hite male physicians and engineers who worked with the equipment" in her department "expressed surprise" that she was the director of respiratory care on "several occasions" and she believed "the reason for the surprise" was her race and gender. *Id.* at 5, 10. Third, she wanted to hire an African-American or Haitian candidate for a position in 2013 but was told by Mr. Kerr to hire an allegedly unqualified white man instead. She "was eventually permitted to hire the person [she] wanted to hire." *Id.* According to Westbrooke, "this situation"—a phrase apparently in reference to Mr. Kerr's interference in her decision to hire her candidate of choice—caused her to complain to "the hospital's internal equal employment officer" ("EEO"), who did nothing. *Id.* at 5, 11.

Westbrooke also asserts that her "supervisors began to retaliate against" her because of her complaints by refusing to hire an assistant director to work for her, depriving her of necessary resources, repeatedly and publicly questioning her competence, and, ultimately, issuing her bad

---

[2] Westbrooke also alleges in her EEOC submission, attached to her Amended Complaint, that Mr. Frankel and others at Bellevue made additional inappropriate comments, some of which Westbrooke reported to the EEO. *See, e.g.*, Am. Compl. at 8, 9 (alleging that Mr. Frankel discussed "his attempts to have sex with two other female employees" with Westbrooke and later told her that his supervisor resigned before Westbrooke was promoted because that supervisor "did not want to oversee a black woman").

employment evaluations. *Id.* For example, Westbrooke alleges that she would submit completed reports to Bellevue's director of intensive care units, Laura Evans, but Ms. Evans would then alter the reports and publicly chastise Westbrooke for failing to include the information that Ms. Evans had deleted—actions that she allegedly never took towards the white men in the unit. *Id.* at 11–12. In September 2014, Westbrooke received her first bad evaluation. After that point, doctors "began calling [her] more frequently and asking questions that they had not asked before" and apparently had not directed at Westbrooke's predecessor. *Id.* at 12. The bad evaluations continued, and Westbrooke complained to the EEO about them. "[T]hey took no steps to help." *Id.* On May 1, 2015, Westbrooke was terminated and told to leave immediately. Other male directors who had been unable to do their work had purportedly been transferred or demoted rather than terminated. *Id.* at 13. Westbrooke was "permitted to stay on payroll until July 2015." *Id.*

Westbrooke filed her Complaint in December 2016 and an Amended Complaint in January 2017, asserting a variety of local, state, and federal claims related to her employment at Bellevue. In the Amended Complaint, she asserts that Defendants discriminated against her and eventually terminated her on the basis of her race, national origin, age, gender, and disability. *Id.* at 2, 5. She also claims that Defendants retaliated against her for complaining about that allegedly discriminatory treatment. *Id.* at 2–3. Now before the Court is Defendants' amended motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). In their motion, Defendants argue among other things that Westbrooke has waived her right to sue them for employment discrimination and retaliation because she signed a release as part of a resignation agreement after her termination. Westbrooke filed an opposition to Defendants' motion to dismiss, and Defendants replied.

## LEGAL STANDARD

To avoid dismissal under Rule 12(b)(6), a pleading "must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In the case of a pro se litigant, the court reads the pleadings leniently and construes them to raise 'the strongest arguments that they suggest.'" *Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 603 (S.D.N.Y. 2009) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). Even where a document is not incorporated into the complaint, however, the court may still consider it if the document is "integral" to the complaint and "there exist no material disputed issues of fact regarding the [document's] relevance," authenticity, and accuracy. *See Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). The Court may also consider any allegations that a *pro se* plaintiff makes in an opposition to a motion to dismiss that are consistent with the complaint. *See Lamberti v. Motorola Sols., Inc.*, No. 12-CV-2472 (PGG), 2013 WL 166367, at *3 (S.D.N.Y. Jan. 16, 2013) (citations omitted).

## DISCUSSION

### A.    Release of Claims

Defendants argue that Westbrooke's present claims are all barred by a release in an agreement that Westbrooke signed after her termination. Westbrooke did not attach this agreement to her Complaint or Amended Complaint, but Defendants attached it to their motion to dismiss. *See* Agreement and Release ("Agreement") (Dkt. 31-3). In the Agreement, Westbrooke "[r]elease[d] and discharge[d] HHC and the City of New York, their officers, employees and

agents" from all "claims, known and unknown, that she may have against any of them, or have had against any of them, arising from any matter or thing done, committed, or suffered to be done on or before the date of this Agreement[,] ... includ[ing] any claims arising from her employment." *Id.* ¶ A(1). In exchange for this release, HHC agreed "to continue to pay Ms. Westbrooke at her current salary until" July 24, 2015—the Agreement's stated effective date of resignation—"by retaining her on payroll" and allowing her to "continue to accrue annual and sick leave." *Id.* ¶¶ A(4), B(2). HHC also promised to provide any prospective employers seeking information about Westbrooke with a neutral reference and to inform them that she had left her position "voluntarily." *Id.* ¶ H. Finally, the Agreement explained that Westbrooke had been "advised by HHC to consult with an attorney of her own choosing and at her own expense prior to signing this Agreement and Release"; that she had "twenty-one (21) days within which to consider this Agreement and Release"; and that she could revoke her consent to the Agreement "[f]or a period of seven (7) days following [her] execution of the Agreement and Release." *Id.* ¶¶ D, E, F. Westbrooke signed the Agreement on June 8, 2015, and a representative for HHC signed it fifteen days later.

For the reasons explained below, this Court agrees with Defendants that this Agreement and Release bars Westbrooke's employment claims here.

### 1. Consideration of the Release

Before addressing Defendants' arguments regarding the enforceability of the release, this Court must determine whether it may consider the Agreement at the motion-to-dismiss stage of this litigation. Although Westbrooke did not explicitly incorporate the Agreement into her pleadings, the Court may nonetheless consider the Agreement if it was integral to the Amended Complaint, relevant, accurate, and authentic. *See Faulkner*, 463 F.3d at 134; *see also Chambers*,

282 F.3d at 153. "[A] plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers*, 282 F.3d at 153 (emphasis omitted). When both notice and reliance are apparent, however, "the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated," and the court may consider the integral document on a motion to dismiss. *Id.* (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)).

Westbrooke apparently concedes that she received, read, and signed the Agreement that Defendants attached to their motion and, thus, that the Agreement is authentic and accurate. *See* P's Mem. Opp. at 2 (Dkt. 34). Her Amended Complaint also relies on the Agreement's existence, terms, and effects. For example, she relies on information that could be found only in the Agreement: she alleges that she was terminated on May 1, 2015, but was nonetheless permitted to stay on the payroll until July 2015; and she notes more specifically that her termination occurred on July 24, 2015, which is the date specified as her resignation date in the Agreement. *See* Am. Compl. at 3, 5; Agreement ¶ A(4). The Amended Complaint also seeks "conf[i]rmation that [Westbrooke's] personnel records indicate that [she] retired from service rather than that [she] was discharged." *See* Am. Compl. at 4. The only apparent basis for this request is the Agreement, in which Defendants promised that Bellevue's Human Resources Department would inform anyone who requested an employment reference that Westbrooke left her position "voluntarily." Agreement ¶ H. Westbrooke thus appears to be seeking to enforce the Agreement, even as she fails to attach it to her pleadings.

Under these circumstances, the Agreement is sufficiently integral to the Amended Complaint that Westbrooke's choice not to include the Agreement "should not so easily . . . allow[]

[her] to escape [its] consequences." *See Cortec Indus., Inc.*, 949 F.2d at 47; *see also RBS Holdings, Inc. v. Wells Fargo Century, Inc.*, 485 F. Supp. 2d 472, 477 (S.D.N.Y. 2007) ("[The plaintiff] cannot avoid the Court's consideration of [an integral] document simply by failing to explicitly reference it in the Amended Complaint."). The Court will therefore consider the document in the context of Defendants' motion to dismiss.

### 2.     Enforceability of and Defenses to the Release

Defendants contend that the release in the Agreement unambiguously bars Westbrooke's claims here. "Under New York law, a release is governed by principles of contract law and a court should enforce a valid release by its clear terms." *Ladenburg Thalmann & Co. v. Imaging Diagnostic Sys., Inc.*, 176 F. Supp. 2d 199, 204 (S.D.N.Y. 2001). Federal courts likewise have "articulated a strong policy in favor of enforcing settlement agreements and releases." *See Levine v. Bd. of Educ. of City of New York*, 152 F.3d 919, 1998 WL 386141, at *2 (2d Cir. 1998) (table) (citing *Ruskay v. Waddell*, 552 F.2d 392, 398 (2d Cir. 1977)). It is thus "appropriate to grant a motion to dismiss on the basis of a binding release agreement where . . . the terms of the agreement are clear and unambiguous." *2 Broadway L.L.C. v. Credit Suisse First Boston Mortg. Capital L.L.C.*, No. 00-CV-5773 (GEL), 2001 WL 410074, at *6 (S.D.N.Y. Apr. 23, 2001).

When a release, like the one found in the Agreement here, applies to federal discrimination claims, the Court must also find that the employee's waiver was "knowing and voluntary" under the totality of the circumstances. *See Bormann v. AT&T Comm'n, Inc.*, 875 F.2d 399, 400–03 (2d Cir. 1989); *see also Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 121 (2d Cir. 2008). This test "departs from ordinary contract principles" by imposing a "more rigorous and subjective voluntariness test" in deference to Congress's purpose of "eradicat[ing] discrimination in employment." *Mandavia v. Columbia Univ.*, 912 F. Supp. 2d 119, 129 (S.D.N.Y.

2012) (internal quotation marks and citation omitted), *aff'd*, 556 F. App'x 56 (2d Cir. 2014). It is also "more stringent" than the voluntariness test for enforcing releases of state and local discrimination claims. *See Loksen v. Columbia Univ.*, No. 12-CV-7701 (CM), 2013 WL 5549780, at *6 (S.D.N.Y. Oct. 4, 2013). Thus, when a release is voluntary and knowing under the federal *Bormann* standard, it will necessarily be considered "knowingly and voluntarily entered [into] under the standards of New York law." *Id.*

The following list of factors, although not exhaustive, guides the Court's assessment of whether a release was voluntary and knowing:

> 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law[,] . . . [7)] whether an employer encourages or discourages an employee to consult an attorney, . . . and [8)] whether the employee had a fair opportunity to do so.

*Bormann*, 875 F.2d at 402–03 (citations omitted). Courts have also considered plaintiffs' assertions of duress and undue influence as additional "factors" in the totality of the circumstances. *See Lamberti*, 2013 WL 166367, at *6.

Of these factors, the relative clarity of the agreement may be the most important, because the Court will enforce a release of claims at the motion-to-dismiss stage only when its terms are clear and unambiguous. *See generally 2 Broadway L.L.C.*, 2001 WL 410074, at *6. Westbrooke does not dispute—and indeed, appears to concede—that she knew the release would prevent her from bringing her employment claims in this lawsuit. *See* P's Mem. Opp. at 2 (recognizing that the release "would preclude [her] from challenging [her] unlawful termination"). And the Agreement itself removes any lingering doubt: the release plainly covers all claims "arising" prior to "the date of th[e] Agreement" against HHC, the City of New York, or their "officers, employees,

and agents"—of which Westbrooke elsewhere concedes Bellevue is one, *see* Am. Compl. at 8 ("Defendant Bellevue Hospital Center is . . . operated by New York City's [H]ealth and Hospital Corporation"). The release also explicitly applies to claims "arising from [Westbrooke's] employment." Agreement ¶ A(1). The Agreement thus clearly and unambiguously applies to, and therefore bars, Westbrooke's current employment-based claims, which all arose prior to the Agreement being signed in June 2015.

At least five of the other *Bormann* factors also favor enforcing the release here. First, Plaintiff's business experience—including her four years as an associate director or director of respiratory care at Bellevue from 2011 until 2015, during which time she alleges that she participated in hiring, wrote reports, attended meetings, supervised staff, and more—strongly suggests that she was able to understand the Agreement and assess the costs and benefits of signing it (as she appears to concede that she did). *See, e.g., Kramer v. Vendome Grp. LLC*, No. 11-CV-5245 (RJS), 2012 WL 4841310, at *3 (S.D.N.Y. Oct. 4, 2012) (holding that a plaintiff's experience as an editor for four years where she received promotions, salary increases, dealt with human resources, paid taxes, and understood that her employment was governed by various laws was more than enough to satisfy this factor); *Prunella v. Carlshire Tenants, Inc.*, 94 F. Supp. 2d 512, 516 (S.D.N.Y. 2000) (concluding that a plaintiff's experience as building superintendent for three years was enough). Second, Westbrooke had plenty of time to consider and reconsider the Agreement, which specified that she had been provided with 21 days to consider the Agreement before signing it and would have 7 days thereafter to revoke it. Agreement ¶ E, F. The Agreement itself reflects that Westbrooke signed the Agreement and had it notarized on June 8, 2015, while HHS signed it on June 23, 2015.[3] "Courts have found far shorter periods sufficient to satisfy [this]

---

[3] Westbrooke states in her opposition papers that she "was forced to accept the release" on May 12, 2015, indicating that she may have had access to the Agreement for more than 21 days before signing it in June.

*Bormann* factor." *Smith v. JPMorgan Chase*, No. 15-CV-808 (PAE), 2016 WL 5339548, at *6 (S.D.N.Y. Sept. 23, 2016) (gathering cases). Third, Westbrooke agreed in the contract that the benefits of the Agreement, including nearly three months' pay and a promise to inform prospective employers that she had left voluntarily, were benefits to which she "would not otherwise be entitled." Agreement ¶ G. She makes no allegation or argument to the contrary in her opposition papers. Fourth, Defendants expressly encouraged Westbrooke in the Agreement to seek out an opinion from private counsel. Agreement ¶ D. And fifth, they gave her a "fair opportunity" to seek out counsel by providing her with plenty of time to do so. *See Bachiller v. Turn On Prod., Inc.*, No. 00-CV-8701 (JSM), 2003 WL 1878416, at *3–4 (S.D.N.Y. Apr. 14, 2003) (holding that the plaintiff "had a fair opportunity to review the agreement and speak with an attorney before signing it" where the agreement provided a 21-day period for consideration), *aff'd*, 86 F. App'x 465 (2d Cir. 2004).[4] These factors, taken together with the clarity of the Agreement and in the totality of the circumstances, demonstrate that Westbrooke knowingly and voluntarily chose to sign the Agreement for the benefits it provided her, and in doing so agreed to give up her right to sue Defendants for her employment discrimination and retaliation claims.

Two *Bormann* factors arguably favor Westbrooke here: she apparently did not participate in drafting the terms of the Agreement and was not represented by an attorney. *See generally Bormann*, 875 F.2d at 402–03. But neither of these factors undermine this Court's conclusion that Westbrooke, as a matter of law, knowingly and voluntarily signed the waiver. Although she did not participate in drafting the terms or seek to negotiate the Agreement, she plainly understood

---

[4] Westbrooke appears to argue that she lacked a fair opportunity to obtain counsel because she was unable to retain private counsel and lacked access to "legal assistance from New York City Employees' Retirement System" after she was terminated. P's Mem. Opp. at 2. That Westbrooke may have lacked the funds to hire a private attorney and could not access Defendants' advisors, however, does not mean that Defendants deprived her of a fair opportunity to retain an attorney.

their impact on her and the ways they benefited her. *See Kramer*, 2012 WL 4841310, at *6 (granting motion to dismiss on the basis of a release even where plaintiff did not appear to have any role in deciding the terms of the release); *see also Benson v. Nynex, Inc.*, No. 97-CV-2168 (WK), 2001 WL 579786, at *3 (S.D.N.Y. May 29, 2001) (holding that the failure to participate in the drafting of an agreement "does not preclude the finding that [the plaintiff] executed the release knowingly and voluntarily"), *aff'd*, 33 F. App'x 10 (2d Cir. 2002). Admittedly, Westbrooke was not represented by an attorney, but Defendants provided her with ample time to seek one out. Given the clarity of the Agreement, the 21-day period for Westbrooke to consider its terms, and the 7-day period for revoking consent, Westbrooke's lack of legal representation does not indicate that the agreement was involuntary. *See Rozenfeld v. Dep't of Design & Const. of City of New York*, 875 F. Supp. 2d 189, 200 (E.D.N.Y. 2012) (gathering cases holding that the failure to consult an attorney "does not automatically render" a release invalid), *aff'd*, 522 F. App'x 46 (2d Cir. 2013). Thus, although Plaintiff's lack of participation in drafting the terms of the agreement and her lack of legal counsel could in other circumstances indicate that a release was involuntary, they do not shift the balance of the *Bormann* factors here, which "overwhelmingly favor" Defendants and enforcing the agreement. *See Nicholas v. Nynex, Inc.*, 929 F. Supp. 727, 732 (S.D.N.Y. 1996).

Westbrooke's assertion of "economic duress" is likewise insufficient—on its own or in combination with her other allegations—to release her from the Agreement. "To void a contract on the ground of economic duress, the complaining party must show that its agreement was procured by means of (1) a wrongful threat that (2) precluded the exercise of its free will." *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011). Although Westbrooke has alleged that she was under financial pressure due to losing her job with Defendants, such pressure "will not, by itself, establish economic duress." *See id.* She must also

11

allege that Defendants engaged in "threatening conduct that is 'wrongful,' *i.e.*, outside of [Defendants'] legal rights." *See id.*

In an attempt to make this showing, Westbrooke asserts that her termination itself was both wrongful and the cause of her financial distress. But Westbrooke's termination, even if executed in violation of discrimination or retaliation laws, was not a "wrongful economic threat" that deprived her of her free will with regard to whether she should sign the Agreement. *See generally Mazurkiewicz v. New York City Health & Hosps. Corp.*, 585 F. Supp. 2d 491, 500 (S.D.N.Y. 2008), *aff'd*, 356 F. App'x 521 (2d Cir. 2009); *cf. Nikci v. Quality Bldg. Servs.*, 995 F. Supp. 2d 240, 249 (S.D.N.Y. 2014) (holding that even a threat of termination prior to signing a settlement agreement did not support an economic duress claim). Indeed, "[t]he doctrine of economic duress arises from the theory that the courts will not enforce an agreement in which one party has unjustly taken advantage of the economic necessities of another and thereby threatened to do an unlawful injury." *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 527 (S.D.N.Y. 2001) (quoting *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 122 (2d Cir.2001)). Here, Westbrooke has not alleged that Defendants engaged in "high pressure or deceptive tactics" or made any threats at all in an attempt to force her to sign the agreement. *See Figueroa v. MRM Worldwide*, No. 12-CV-4115 (HBP), 2014 WL 902953, at *10 (S.D.N.Y. Mar. 7, 2014). Westbrooke points to no action by Defendants that deprived her of a meaningful choice between accepting the Agreement and seeking a new job while pursuing her legal remedies. *See, e.g., Nasik Breeding & Research Farm Ltd.*, 165 F. Supp. 2d at 527; *Nicholas*, 929 F. Supp. at 733. Although this choice may have been a very difficult one for Westbrooke given her financial situation, the "case law is clear that 'difficult choices do not constitute duress.'" *See Figueroa*, 2014 WL 902953, at *10 (citation omitted). Thus, Westbrooke has not plausibly alleged economic duress,

either as a stand-alone defense or as a factor to be weighed in favor of finding that she did not enter the Agreement knowingly and voluntarily. *See Kramer*, 2012 WL 4841310, at *6 (rejecting the plaintiff's arguments regarding economic duress and granting a motion to dismiss on the basis of a release under similar circumstances).

The Court recognizes the difficulty of addressing such a multi-factor, factual inquiry at the motion to dismiss stage. When "the balance of the *Bormann* factors tips decidedly in [the defendant's] favor," however, granting a motion to dismiss on the basis of a release is appropriate. *See Smith*, 2016 WL 5339548, at *5; *see also Miller v. New York City Dep't of Educ.*, 71 F. Supp. 3d 376, 382 (S.D.N.Y. 2014) (finding an agreement to be knowing and voluntary at the motion to dismiss stage and rejecting plaintiff's arguments that two *Bormann* factors favored his position); *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) (granting motion to dismiss based on a release even where the plaintiff had not been represented by an attorney). Of course, courts in this District regularly deny motions to dismiss based on releases where additional factual development is necessary to assess the factors, where there are pertinent factual disputes, or where the plaintiff has otherwise plausibly alleged that the release was not knowing and voluntary. *See, e.g., Mandavia v. Columbia Univ.*, 912 F. Supp. 2d 119, 132 (S.D.N.Y. 2012) (denying motion to dismiss where four *Bormann* factors supported the plaintiff's argument that the agreement was not knowingly and voluntarily executed); *Johnston v. Carnegie Corp. of New York*, No. 10-CV-1681 (PAC) (DF), 2011 WL 1085033, at *9 (S.D.N.Y. Feb. 24, 2011), *report and recommendation adopted*, 2011 WL 1118662 (S.D.N.Y. Mar. 23, 2011) (denying motion to dismiss where additional information was needed, a few factors weighed in favor of the plaintiff, and the parties disputed "the amount of consideration due under" the release agreement). The relevant facts here, however, are undisputed and plainly favor finding the release to be knowing

and voluntary as a matter of law. The Court is thus able to conclude even at this stage that the release bars Westbrooke's claims.[5]

In any event, the Court alternatively holds that Westbrooke has ratified the agreement. Under New York law, "the person claiming duress must act promptly to repudiate the contract or release or . . . be deemed to have waived [the] right to do so." *VKK Corp.*, 244 F.3d at 122 (citation omitted). The same is true for plaintiffs claiming that their releases were unknowingly or involuntarily made. *See Smith*, 2016 WL 5339548, at *9. Where, as here, a plaintiff challenging a release has made no attempt to "return the money she received from [Defendants] in consideration for the Release," the plaintiff is "deemed to have ratified the Release and is thereby barred from challenging its validity." *See id.* (citation omitted). Although Westbrooke baldly asserts that she "immediately tried to challenge the release," she does not allege when or how she purportedly did so. P's Mem. Opp. at 2. Under these circumstances, Westbrooke may not "retain the benefit of the bargain while circumventing her own obligations thereunder." *Id.* (citation omitted).

## B.    Remaining Claim

Westbrooke's Amended Complaint includes one claim that is not subject to the Agreement's release: her request for confirmation that her "personnel records indicate that [she]

---

[5] Westbrooke cites two additional cases where she says "a defendant's motion to dismiss has been denied despite the fact that" the plaintiff signed a release. P's Opp. at 3. First, in *Pacheco v. 32-42 55th St. Realty, LLC*, the New York Appellate Division found that the "plaintiff's allegations were . . . sufficient to support a possible finding that the defendants procured the release by means of fraud" and "under circumstances which indicate unfairness." 33 N.Y.S.3d 301, 303 (N.Y. App. Div. 2016) (citation omitted). The facts here, as explained above, reveal no unfairness that would indicate a lack of voluntariness, and Westbrooke does not allege any facts indicating that Defendants defrauded her. Second, in *Guzman v. Concavage Marine Construction Inc.*, the court dealt with waiver in the context of the Fair Labor Standards Act, which imposes additional requirements for releases to be valid that are not relevant here. *See* 176 F. Supp. 3d 330, 337 (S.D.N.Y. 2016). The plaintiff in that case also plausibly alleged that there was a threat underlying his economic-duress theory, which Westbrooke fails to do here for the reasons explained above. *See id.* at 338. Thus, neither of these cases affects the Court's conclusion that Westbrooke's employment claims must be dismissed based on her release of claims in the Agreement.

retired from service rather than that [she] was discharged" is apparently a claim to enforce the terms of the Agreement itself. Am. Compl. at 4. The Agreement, meanwhile, expressly states that the parties may "institut[e] legal action to enforce" the Agreement's terms, which included Defendants' promise to inform prospective employers that Westbrooke left her position voluntarily. Agreement ¶¶ H, L.

To state a claim under Rule 12(b)(6), however, Plaintiff must plausibly allege facts indicating that she is entitled to the relief she seeks. *See Ashcroft*, 556 U.S. at 678. Even construing liberally Plaintiff's allegations in both the Amended Complaint and her opposition papers, she alleges no facts indicating that Defendants have breached their promise to provide prospective employers with neutral references. She has thus failed to state a claim under Federal Rule of Civil Procedure 12(b)(6) for breach of the Agreement, and that claim is dismissed as well.

## C.   Leave to Amend

In Westbrooke's opposition papers, she requests leave to amend "to address any deficiencies identified by the Court." P's Mem. Opp. at 1. "Generally, leave to amend should be freely given, and a *pro se* litigant in particular should be afforded every reasonable opportunity to demonstrate that [s]he has a valid claim." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (citation omitted). "A *pro se* complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Id.* (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)). Even so, "leave to amend a complaint may be denied when amendment would be futile." *Id.* (quoting *Tocker v. Philip Morris Cos.*, 470 F.3d 481, 491 (2d Cir. 2006)).

Here, Westbrooke has given this Court no indication—in her Amended Complaint, her opposition papers, or otherwise—that she has any plausible basis for arguing that the Agreement

is unenforceable against her. Nor has she indicated the existence of any factual basis for her claim to confirm that Defendants' employment records reflect that she resigned. Even so, the Court is cognizant of the highly factual nature of the *Bormann* inquiry, of Plaintiff's (albeit presently unsupported) assertion that she "immediately tried to challenge the release" as it relates to the ratification issue, and of Plaintiff's request for leave to amend. P's Mem. Opp. at 2. Thus, in an abundance of caution, the Court will permit Plaintiff to file a more fulsome motion for leave to amend and a proposed second amended complaint in light of this decision. Westbrooke is advised that, to avoid the effects of the release, her proposed second amended complaint must plausibly allege—to the extent that she can do so in good faith—both that the Agreement is voidable and that she has not ratified the agreement. Additionally, in her proposed second amended complaint, Westbrooke must include any and all facts that she can allege in good faith to support the merits of her discrimination claims and, to the extent she still asserts it, her claim that Defendants have not complied with the Agreement. Westbrooke must file her motion and a proposed second amended complaint no later than October 1, 2018.

## CONCLUSION

For the reasons explained above, Defendant's motion to dismiss the Amended Complaint is granted. Plaintiff may file a motion for leave to amend and a proposed second amended complaint so long as she does so no later than October 1, 2018. Defendants shall have until October 12, 2018, to submit opposition papers. The Court will consider the matter fully briefed on October 12, 2018. No extensions of time will be granted absent good cause.

The Clerk of Court is respectfully directed to terminate the motion pending at docket number 30 and to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated:    August 31, 2018
          New York, New York

Ronnie Abrams
United States District Judge